28 C.C.P.A.(Patents)

### KNUTSON v. ELLSON.

Patent Appeal No. 4508.

Court of Customs and Patent Appeals.
July 2, 1941.

Eugene E. Stevens, of Washington, D. C., for appellant.

Stuart C. Barnes, of Detroit, Mich., for appellee. .

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an interference proceeding in the United States Patent Office, wherein the Board of Appeals affirmed a decision of the Examiner of Interferences awarding to appellee priority of the invention defined in the three counts constituting the issue of the interference. From such award appellant took this appeal. Appellee has made no appearance in this court.

Count 2 is illustrative and reads as follows: "2. A detachable bit rock drill comprising a shank having a diametrical slot of dovetail cross-section in its bit engaging end, said slot being arcuate in longitudinal vertical section, and a detachable bit having a diametrical tongue of dovetail cross-section on its shank engaging end, said tongue being arcuate in longitudinal vertical section corresponding to the curvature of the slot into which it is inserted, and coacting means between bit and shank for preventing the insertion of the tongue into the slot past a position in which the axes of bit and shank are coincident."

The interference is between an application of appellant filed March 31, 1938, and an application of appellee filed May 5, 1938.

Appellee being the junior party, the burden was upon him to establish priority of invention by a preponderance of evidence.

The involved invention is sufficiently described in the count above quoted.

Appellant, a citizen of Canada, in his preliminary statement alleged that he had filed a Canadian application for the involved invention on March 26, 1938, and that the invention was introduced into the United States by filing his application on March 31, 1938.

Appellee, a citizen of Detroit, Michigan, alleged that he made the involved invention in Canada, and further alleged as follows: "(d) That the invention was introduced into the United States on or about December 28, 1937, by reason of the deponent coming to Detroit, Michigan, and by reason of the disclosure of said invention by the deponent to Miss B. A. Johannessen and to Mr. C. J. McKinney, both of Detroit, Michigan; that these disclosures were in connection with business having to do with the development and manufacture of the invention, and that further introduction into the United States was made on March 1, 1938, by a disclosure to the deponent's attorney, Arthur Raisch, also of Detroit, Michigan, the latter disclosure being made in connection with the obtaining of patent protection on the invention."

Inasmuch as appellant did not introduce in evidence his alleged Canadian application, he is confined to the filing date of his United States application, March 31, 1938, for conception and constructive reduction to practice of the invention.

Both parties took testimony.

It appears that appellant is a mechanic residing in South Porcupine, Ontario, Canada, employed at the Paymaster Consolidated Mines, located near said town; that on or about October 8, 1937, he made the invention here involved and on the same day he disclosed it to others; that on said October 8, 1937, he made a wooden model of the invention and also two sheets of sketches disclosing it.

It is appellant's contention that he inadvertently left this model in an unlocked box in the room where he worked at the mines, and that it was accessible to his co-employees, one of whom was Charles Erickson, who was employed by the same company in a building nearby; that shortly after this time he, Erickson, was in possession of the invention and made some models thereof; that Erickson derived the invention from appellant and disclosed it to appellee, who was a close friend of Erickson, and that therefore, he, appellant, is entitled to an award of priority upon the ground of originality.

We do not deem it necessary to pursue this branch of the case further, for we are in agreement with the Patent Office tribunals that there is no substantial evidence in the record that appellee derived the invention directly or indirectly from appellant.

Appellee is a mining engineer and geologist, educated at the Michigan College of Mines. He testified that he was familiar with rock drilling and had been chief engineer and assistant manager of a mine using from three to five thousand rock drill bits a day. He testified that he con-

ceived the involved invention at the home of said Charles Erickson in Timmins, Ontario, about Christmas time, 1937; that he made a sketch on December 27, 1937, which was introduced in evidence, disclosing the invention; that this sketch was signed by himself and Erickson; that Erickson a couple of days thereafter made a wooden model of the invention; that about the first of January, 1938, he (appellee) returned to Detroit, bringing with him said wooden model, and disclosed the invention to one Bertha A. Johannessen, and that between January 1 and March 1, 1938, he also disclosed it to one Carlos J. McKinney; that he returned to Canada about March 2, 1938, and while there received from said Erickson a steel model embodying the invention; then he returned to Detroit about March 8, 1938, bringing said steel model with him, and showed it to said Johannessen and McKinney. Said steel model was introduced in evidence.

The Examiner of Interferences found, and appellant concedes, that appellee was in possession of the invention in the United States on March 8, 1938. The examiner therefore awarded to appellee said date of March 8, 1938, for conception of the invention.

■ It seems that appellee contended before the Examiner of Interferences that the invention is of such a simple character that the mere making of his steel model and bringing it into the United States should be held to constitute an actual reduction to practice. The examiner held otherwise, and the Board of Appeals impliedly affirmed the view of the examiner. In the decision of the Examiner of Interferences attention was called to appellee's own testimony that his construction was a radical departure from the conventional art, and that this departure involved both structure and function. We are convinced that, to constitute an actual reduction to practice of the invention, tests of the device were necessary, and it is conceded that none were made.

After making some general comments upon the decision of the Examiner of Interferences, the Board of Appeals in its decision stated:

"The only question which we believe may be open to controversy is as to the diligence of the party Ellson. If he was trying to persuade the attorney Raisch to prepare his patent application when he saw him in March, 1938, we think that there is no reasonable doubt but that he was diligent at the time the Knutson application was filed, March 31, 1938, and that the diligence continued until the Ellson application was filed, May 5, 1938.

"It is true that neither Ellson nor Raisch definitely stated that Ellson requested Raisch to prepare an application in March but we do not believe that any one reading the Raisch testimony can have any doubt but that this witness intended to convey the impression that the party Ellson was seeking to have him prepare an application when they conferred together in March.

"As to the Ellson testimony on page 31, in answering questions 80 and 81, it seems clear that he was testifying with respect to preparing an application when he stated that Raisch decided to help him out, because this help was given by turning Ellson over to another attorney in the Raisch office who prepared the application.

"The party Knutson did not see fit to cross-examine the witness Raisch nor did he cross-examine the party Ellson as to his conferences with Raisch.

"In our opinion, the testimony of the witness Raisch can be accepted as establishing the fact that the party Ellson was making a reasonable attempt to have a patent application prepared at the time that the Knutson application was filed."

■ We are in agreement with the view of the board that the only question open to controversy is the diligence of appellee in reducing the invention to practice. He is chargeable with such diligence from immediately prior to March 31, 1938, appellant's filing date, to May 5, 1938, the filing date of appellee.

It will be observed that the Board of Appeals relied principally upon the testimony of one Arthur Raisch, a patent attorney and friend of appellee, to establish diligence by appellee in applying for a patent. There is nothing in the testimony of appellee showing such diligence, and his testimony and that of the witness Raisch are to a degree in conflict.

It will be observed that in the preliminary statement of appellee hereinbefore quoted, it is alleged that the introduction of the invention into the United States prior to March 1, 1938, was "in connection with business having to do with the development and manufacture of the invention," and it is further alleged that subsequent introduction into the United

States was made on March 1, 1938, at Detroit, Michigan, by disclosure to appellee's attorney Raisch, "in connection with the obtaining of patent protection on the invention."

Raisch, however, testified that a full disclosure of the invention was made to him by appellee in the middle of February, 1938, and that at that time appellee showed him a drawing illustrating the invention.

The testimony of Raisch, in so far as pertinent to the question of appellee's diligence, is as follows:

"Q. 3. Are you acquainted with Mr. Carl W. Ellson? A. Yes, I have known Mr. Ellson since 1921 when we attended the Michigan College of Mines at Houghton, Michigan, together.

"Q. 4. Have you seen Mr. Ellson often since then? A. After graduation I saw Mr. Ellson in 1927 when I had the pleasure of visiting him at the Lake Shore mines in Ontario, and he was the chief engineer there. Since then I had not seen Mr. Ellson for nearly ten years, when he came into my office in the middle of February, 1938.

"Q. 5. What was his mission then? A. Mr. Ellson came in at that time about a bit, detachable bit, for drilling ore bodies. He was interested in obtaining a patent on it and exploiting the invention.

"Q. 6. Will you describe briefly your contacts with Mr. Ellson, if you had such, between the time that he came to see you in February, 1938, and the ensuing four months, let us say? A. Well, in the middle of February I was engaged in assisting at the trial of a suit brought by James J. Sunday against the Novi Equipment Company. At the time that Mr. Ellson came in I advised him that I would be too busy to do any work for him for at least a month or perhaps six weeks, because I knew that the Novi Equipment suit was going to continue, at the rate it was going, for at least a couple of weeks, and after that time we had a suit in this office, the Oxford Varnish Company v. Ternstedt Manufacturing Company and General Motors Corporation, coming up, which had been set for the first of April, and there was considerable work to be done on that suit because it involved four rather complicated patents and a record of six or seven thousand pages. So, I got Mr. Ellson's story; I saw him one evening after court had been dismissed. It was either on the 16th or 17th of February, because I

remember I was awfully tired, having been on the witness stand all that day. I have refreshed my memory from the three time slips which I made out on those days, February 16th, 17th and 18th, 1938. At that time Mr. Ellson made a full description, an oral description, of his detachable bit to me, and showed me a drawing which has been identified as Exhibit 5. This drawing, to my best recollection, is in the same condition as it was when he showed it to me in the middle of February, 1938. I did not see Mr. Ellson again until the middle of March, but in the interim he had called me several times, and of course the reason I recollect when he came to me, or when I first saw him, was it is always a pleasant surprise to see an old classmate after several years have elapsed, particularly when we had a large group of mutual friends in the mining engineering field, who are scattered over the world, and numerous of them up in the mining area in Canada. The thing that embarrassed me was that Mr. Ellson, being an old friend of mine, was financially embarrassed, that is, he did not have any money to pay down on the amount of work which he wanted done, and yet I could not make up my mind whether I would refuse to do the work or not without receiving a down payment. In the middle of March when I talked with him he told me that he was very hopeful of raising funds, but being a patent attorney of some experience I was not very optimistic. The next time I saw Mr. Ellson was during the last of March. He came into the office with Mr. Erickson, and at that time we discussed the bit, which is the subject matter of this interference, and which is shown in the Ellson application in this interference, and even at that time he had no cash to go forward with the filing of the application, and he had been unsuccessful in following out my previous recommendations of contacting with companies that would be interested in manufacturing the bit, or taking a license. All during this period I was busy preparing for the trial of the suit brought by the Oxford Varnish Company against General Motors which is evidenced by my time slips, March 16th, 17th, March 24th, 26th, and on up nearly every day until April 22nd, 1938. Finally around, I think it was the 6th or 7th of April, after the trial of the Oxford Varnish suit had begun, I finally decided that we would simply take a chance on getting paid, and I advised Mr. Ellson that I would refer this application to one of my

associates, Mr. Choate, and let him file the application and prosecute it, and I would assist him in every way that I could, and Mr. Ellson was agreeable to that. So some time during the early part of April I turned this matter over to Mr. Choate, and he then proceeded to file the Ellson application in interference. The thing that was embarrassing for me during practically all of March and the early part of April was that Mr. Ellson would call me quite frequently and advise me that he had not been successful in raising funds, and I would be embarrassed for two reasons, one was that I was so busy in preparation and taking care of these other matters that I have referred to that I could not have handled his work if I had wanted to, and the second was I did not want to do the work, or have someone else in the office do the work, if it was merely to result in a liability."

Appellee's testimony respecting his meetings with the witness Raisch is as follows:

"Q. 70. In this period which I have just referred to, in the early part of the year 1938, prior to the time that you returned to Canada in March, did you contact any attorney with regard to your idea? A. Yes.

"Q. 71. What attorney? A. Arthur Raisch.

"Q. 72. Do you remember when you first went to him? A. Yes.

"Q. 73. When? A. Around in February, and the precise date I do not remember.

"Q. 74. Did you call on him later? A. Yes.

"Q. 75. When? A. I called on him in March, around March, I believe I called in here on March–well, it was after the 7th of March, just a little bit, not very much.

"Q. 76. Did you disclose your idea to Mr. Raisch upon these visits to him? A. *Yes; not very definitely, or anything; the reason that I came over to see Arthur Raisch about it is because I did not know just how to proceed about it, and, after all, it was just an idea;* I didn't have any money to go ahead with it, and after all I knew Arthur Raisch when I went to college, and naturally knowing he was a patent attorney, because C. G. McCullum, down here, and Louis Sheldon, who is out with the Ford Motor Company, had mentioned his name, and after all, Louis Sheldon is the man who instructed us when we were in college, and naturally I would turn to him for aid or assistance on this. (Italics ours.)

"Q. 77. Do you remember whether or not Mr. Raisch was able at that time to take up your work? A. He could not see me because he was busy; I mean he could see me, I guess, but he happened to be busy on something else at that time when I dropped in. I remember that part.

"Q. 78. Do you remember calling Mr. Raisch at all? A. Yes, I called him on the phone several times, but he was out always.

"Q. 79. You have stated thus far that you came to see Mr. Raisch in February and early in March. When did you next see him? A. Well, I will tell you one date I did see him on, I saw him on,—I do know definitely I was in this office on April 11th; that I can prove; I did not keep any record of the actual date I came in here on.

"Q. 80. What disposition did Mr. Raisch finally make of the matter? A. Well, he decided to help me out.

"Q. 81. Was he going to handle the work himself? A. He said that he was pretty busy and he turned the work over to Robert A. Choate."

It will be observed that appellee did not testify that he sought to retain Raisch for the purpose of making application for a patent; he did testify that in February and March he did not disclose definitely to Raisch the invention. We repeat his testimony upon this point:

"Q. 76. Did you disclose your idea to Mr. Raisch upon these visits to him? A. *Yes; not very definitely, or anything; the reason that I came over to see Arthur Raisch about it is because I did not know just how to proceed about it, and, after all, it was just an idea; * * *"* (Italics ours.)

It does not appear from appellee's testimony that prior to April 11, 1938, the matter of retaining Raisch to file a patent application was ever discussed between them, nor is there any testimony in the record that appellee could not have earned or borrowed money to employ an attorney for the purpose of making application for a patent.

With respect to appellee's financial circumstances, the Examiner of Interferences in his decision stated: "* * * The evidence as to his poverty is not very definite,

522

and does not reveal exactly to what extent he could have carried out his plans without financial assistance. However, all of the circumstances together make it quite clear that he had very little capital and only slight prospects of raising any until after Raisch had decided to run the risk of nonpayment. The reluctance of Raisch to begin work on an application for Ellson, in spite of their long acquaintance and apparent friendship, is in itself corroborative of Ellson's allegations of poverty. * * *"

However, appellee testified upon this point as follows:

"XQ297. I suppose you were in this position, that you had a problem on your hands to get this proposition financed and put on the market? A. I did.

"XQ298. And that problem you discussed with your acquaintances from time to time, every time you would sit down? A. A little bit more than that, I would say, because I went out of my way, and I threw the major portion of myself into it, and even to the extent that I had to turn around and borrow money from Miss Johannessen to live on because I neglected other jobs which might have brought me immediate money.

"XQ299. How much money would you say, several hundred dollars? A. Yes, it would have brought in several hundred dollars if I could have collected it.

"XQ300. When was that, during the months of January, February and March? A. All along through there.

"XQ301. You were neglecting your own business trying to get somebody to exploit this and manufacture it? A. That is right, because I decided I was going to take one of my jobs and make a complete success rather than fool around with a lot of them, and then when I started out on this bit job I thought, 'I am going to go ahead'; 'this is one job I am going to complete.'

"XQ302. How much money did you decide would be necessary to carry on the manufacture of it? A. I do not understand that question. To carry on the manufacture of this would take a lot of money. I was trying to raise, for the completion of this, around $15,000 to $30,000, but I do not know that all of that would be necessary, depending upon the business deal that is made with the man that is going to manufacture it. If he chose to go along and help out, why, you could not say that so much money—

"XQ303. (Interposing): Were you willing to come down as low as $5,000? A. To start with, yes, to get a start.

"XQ304. So the amount of money you were seeking was between $5,000 and upwards to say $15,000 to $30,000? A. That is right.

"XQ305. You spent your time actively between January and the first of April, or well into April, doing that? A. That is right.

"XQ306. So that your time was, you might say, constantly occupied in seeking that sum of money for that purpose? A. More or less it was occupied with that.

"XQ307. And that continued from January up until April, until you finally closed with Townsend? A. That is correct.

"XQ308. That caused you to neglect your own business so that you were deprived of the ordinary income on which you would live? A. Absolutely."

It therefore appears that appellee made no effort whatever to raise money, either by working or borrowing, to enable him to employ counsel for the purpose of making application for a patent. On the contrary, his testimony fairly shows that he could have earned sufficient money to retain counsel to apply for a patent, but instead of this he chose to give up his work and devote his entire time to the commercial exploitation of the invention. No witness in his behalf, other than Raisch, testified that appellee even considered applying for a patent unless he could first be assured of money with which to exploit the invention commercially, which assurance he finally did receive in April 1938, securing from one Townsend an agreement to advance him $5,000, the first payment of $500 being made by check dated April 19, 1938, payable to Miss Johannessen, who was made trustee in the transaction. It does not appear that any portion of this sum was used in paying attorneys' fees in the matter of the application for a patent.

Moreover, in addition to the testimony of appellee hereinbefore quoted, appellee testified positively that his entire efforts between January and April, 1938, were directed to the commercial exploitation of the invention. In response to questions by his own counsel, appellee testified as follows:

"Q143. Mr. Ellson, you can state positively then that you were working all during February, March and April, 1938, to

raise funds to manufacture and exploit your bit? A. Yes.

"Q144. And you were finally successful in April? A. That is right."

Upon cross-examination, appellee further testified as follows:

"XQ145. The last question and answer, Mr. Ellson, was that you were busy all the time from January 1st until April, in seeking to obtain money to manufacture and exploit the invention, and then you were successful in April; that is the fact, isn't it? A. I was busy the major portion of the time on that.

"XQ146. Your successful efforts terminating in your arrangements with Townsend? A. That is right.

"XQ147. And thereby you brought about an arrangement where you were going to manufacture this article? A. As a result of the money he let me have, I brought it about in that manner."

That efforts toward commercial exploitation of an invention do not constitute diligence in reducing it to practice is well established. Fageol v. Midboe, 56 F. 2d 867, 19 C.C.P.A., Patents, 1117; Hurd v. Smith, 97 F.2d 147, 25 C.C.P.A., Patents, 1137; Preston et al. v. White, 97 F.2d 160, 25 C.C.P.A., Patents, 1219; Petersen v. Thomas, 56 App.D.C. 113, 10 F.2d 908.

We are strongly impressed from our study of appellee's testimony that he was unwilling to expend any money in applying for a patent unless he was first assured that he could make the device profitable commercially. The fact that the sums of money he was seeking in connection with the invention ranged from $5,000 to $30,000 clearly indicates this.

Appellee was chargeable with diligence in reducing the invention to practice from immediately prior to appellant's filing date, March 31, 1938, to his own filing date, May 5, 1938.

There is no general rule as to what constitutes diligence applicable to all cases, but what is due diligence must be determined from the particular facts of each case. Beidler v. Caps et al., 36 F.2d 122, 17 C.C.P.A., Patents, 703; Jones v. Evans, 46 F.2d 197, 18 C.C.P.A., Patents, 866.

Appellee is an educated man and apparently a competent mining engineer. If he approached his friend Raisch for the purpose of employing him to apply for a patent for his invention, it is strange that he did not so directly testify. On the contrary, he testified that in his first meetings with Raisch he did not definitely disclose to him his invention, but stated "it was just an idea." There is no testimony by appellee that he ever desired or intended to retain Raisch to apply for a patent prior to April 11, 1938, when some arrangement was made between them for the preparation of a patent application by an attorney in the employ of Mr. Raisch's firm. This was nearly two weeks after the critical date of March 31, 1938, when appellee's duty of diligence began.

So far as Mr. Raisch's testimony is concerned, he is an experienced lawyer, and if appellee sought to retain him prior to March 31, 1938, we cannot understand why Raisch did not so directly testify. He well knew the criticalness of the date of March 31, 1938. The Board of Appeals in its decision stated that "we do not believe that any one reading the Raisch testimony can have any doubt but that this witness intended to *convey the impression* that the party Ellson was seeking to have him prepare an application when they conferred together in March." (Italics ours.) It may be that Raisch intended to convey such impression, but there was no reason why he should not have stated the facts upon which such impression was based. In view of the failure of appellee to testify that prior to March 31, 1938, he sought to retain Raisch to prepare an application for a patent, and in view of appellee's testimony that his entire efforts in January, February and March were directed to the commercial exploitation of the invention, we do not think the case should turn upon a mere impression which Raisch may or may not have sought to convey.

Moreover, in view of appellee's testimony, it is clear to us that Raisch was mistaken as to the time of appellee's disclosure to him of the invention.

The burden was upon appellee to establish, by a preponderance of evidence, diligence in reducing the invention to practice from immediately prior to March 31, 1938, to May 5, 1938. Giving due weight to all of the evidence in behalf of appellee upon this point, we feel compelled to find that appellee has not sustained this burden, and the decision of the Board of Appeals is reversed.

Reversed.